**UNITED STATES of America**

v.

**Donald FELL**

**No. 2:01–CR–12–01.**

United States District Court,
D. Vermont.

Sept. 24, 2002.

William B. Darrow, Asst. U.S. Attorney, Gregory Lane Waples, Office of the United States Attorney, District of Vermont, Burlington, VT, for U.S.

Alexander Bunin, Gene Primono, AFPD, Office of the Federal Public Defender, Albany, NY, for Donald Fell.

## OPINION AND ORDER

SESSIONS, District Judge.

In two motions Defendant Donald Fell has moved this Court to declare the Federal Death Penalty Act of 1994 ("FDPA" or the "Act") unconstitutional. For the reasons that follow, Fell's motions (Docs. 44 and 65) are granted on the ground that the FDPA's § 3593(c)'s direction to ignore the rules of evidence when considering information relevant to death penalty eligibility is a violation of the Due Process Clause of the Fifth Amendment and the rights of confrontation and cross-examination guaranteed by the Sixth Amendment.

## I. Introduction

Donald Fell was indicted on four counts arising out of the abduction and murder of Teresca King in late November 2000. Counts 1 and 2 charge Fell with carjacking and kidnapping, both with death resulting. These two counts are charged as capital crimes. On January 30, 2002, the government filed a Notice of Intent to Seek Death Penalty.

On July 8, 2002 the grand jury returned a superseding indictment charging the same four offenses as the original indictment. In addition, however, the superseding indictment contained a "Notice of Special Findings" alleging that Fell's conduct met the threshold culpability factors specified in 18 U.S.C.A. § 3591(a)(2) (West 2000), and that three statutory aggravating factors, §§ 3592(c)(1), (6) and (16), also applied to the crimes charged. The statutory aggravating factors described in the superseding indictment are (1) that Fell caused the death of King during the commission of the crime of kidnapping, § 3592(c)(1); (2) that Fell's behavior was especially heinous, cruel or depraved in that it involved serious physical abuse to King, § 3592(c)(6); and (3) that Fell intentionally killed or attempted to kill more than one person in a single criminal episode, § 3592(c)(16).

Also on July 8, 2002, the government filed a Supplemental Notice of Intent to Seek Death Penalty, giving notice of four non-statutory aggravating factors that it proposes to prove as justifying a sentence of death in this case. These factors are (1) that Fell participated in King's abduction to facilitate his escape from the area in which he and an accomplice had committed a double murder; (2) that he participated in King's murder to prevent her from reporting the kidnapping and carjacking; (3) that King's murder was part of substantial premeditation involved in committing the crime of carjacking; and (4) that Fell caused loss, injury and harm to King and her family. These non-statutory aggravating factors were not submitted to the grand jury.

Fell's first motion seeks a declaration that the FDPA is unconstitutional because (1) it fails to avoid sentences of death for the factually and legally innocent; (2) the FDPA's sentencing scheme is incomprehensible to a jury, in violation of the Fifth and Sixth Amendments; (3) the FDPA fails to narrow adequately the class of persons eligible for the death penalty, in violation of the Eighth Amendment; (4) the relaxed evidentiary standard applicable to the penalty phase of trial renders any findings unconstitutional; (5) the indictment fails to charge a capital crime;

(6) a jury's consideration of non-statutory aggravating factors permits the arbitrary and capricious imposition of a sentence of death, in violation of the Eighth and Fourteenth Amendments; (7) the FDPA's delegation to the government of the power to define aggravating factors violates separation of powers principles and the non-delegation doctrine, in violation of Article I, § 1; (8) its delegation to the government of the power to define non-statutory aggravating factors after the crime but before trial violates the *ex post facto* clause; (9) the FDPA is internally inconsistent, precluding the use of non-statutory aggravating factors; (10) the use of non-statutory aggravating factors without providing for proportionality review is unconstitutional; (11) the death penalty is under all circumstances cruel and unusual punishment in violation of the Eighth Amendment; (12) the death penalty violates binding international law.

In Fell's supplemental motion, filed July 23, 2002, he argues that the reasoning of the United States Supreme Court in the recently decided *Ring v. Arizona*, 536 U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), mandates a finding that the FDPA is unconstitutional, and that the special findings be struck from the superseding indictment.

This Court concludes that the FDPA cannot withstand constitutional scrutiny through the lens of the *Jones, Apprendi*, Ring line of decisions. The issues raised by the application of these decisions' reasoning to the FDPA are discussed more fully below. Although some of the other issues raised by the defense may have legal merit, *see, e.g., United States v. Quinones*, 205 F.Supp.2d 256 (S.D.N.Y.2002) (FDPA is unconstitutional deprivation of due process), in view of the disposition of the *Ring* issues, the Court does not address them at this time.

## II. Historical Context of Federal Death Penalty Legislation

Capital punishment as the penalty for the commission of certain federal crimes is as old as the nation itself. That the government could, under certain circumstances, deprive an individual of life was recognized when the Bill of Rights was drafted, in the language of the Fifth Amendment: "[n]o person shall be held to answer for a capital . . . crime, unless on . . . indictment of a Grand Jury, . . . nor shall any person . . . be deprived of life, . . . without due process of law." U.S. Const. Amend. 5. In 1790 the First Congress enacted a comprehensive Act for the Punishment of certain Crimes Against the United States that among other things defined the crimes of treason, murder, piracy and forgery, and specified that the penalty upon conviction was death. Act of April 30, 1790, ch. 9, §§ 1–14, 1 Stat. 112–115; *see also Furman v. Georgia*, 408 U.S. 238, 304, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Brennan, J. concurring).

Also as old as the nation is the recognition that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *see Furman*, 408 U.S. at 306, 92 S.Ct. 2726 (Stewart, J. concurring) (penalty of death is unique in its total irrevocability; unique in its rejection of rehabilitation; unique in its absolute renunciation of all that is embodied in our concept of humanity). The need for more rigorous or scrupulous procedure when considering the imposition of a sentence of death has accompanied that recognition. *See Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality op.). For example, the First Congress specified that in cases of treason or other capital crimes

an accused receive a copy of the indictment and a list of the jurors and witnesses, have the benefit of compulsory process, and have the assistance of and free access to up to two counsel "learned in the law." Act of April 30, 1790, ch. 9, § 29, 1 Stat. 1181; *see also Murray v. Giarratano,* 492 U.S. 1, 20, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989). Although the rights to counsel and to compulsory process may be thought of today as traditional components of the panoply of rights afforded any criminal defendant facing a jail sentence, in the late eighteenth century they marked an acknowledgment that heightened reliability was required when the mandatory punishment upon conviction was death. *See Reid v. Covert,* 354 U.S. 1, 77, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Harlan, J. concurring) (process due offender faced with prison does not necessarily satisfy process due in capital case); *Williams v. Georgia,* 349 U.S. 375, 391, 75 S.Ct. 814, 99 L.Ed. 1161 (1955) (articulating distinction between capital and non-capital offenses).

The nation's first century witnessed debate over the imposition of the death penalty at the state and federal levels. *See Furman,* 408 U.S. at 336–337, 92 S.Ct. 2726 (Marshall, J. concurring). Juries and legislatures alike reacted to the inflexibility of the mandatory imposition of the death penalty, leading some juries to acquit capital defendants in situations where they felt the death penalty was not warranted, and some state legislatures to abolish the death penalty entirely or to significantly reduce its scope. *See id.,* 408 U.S. at 338–39, 92 S.Ct. 2726; *see also Furman,* 408 U.S. at 297–98, 92 S.Ct. 2726 (Brennan, J., concurring). In 1897 Congress enacted a statute entitled "An act to reduce the cases in which the penalty of death may be inflicted," that provided juries in federal murder cases with unlimited discretion to qualify a verdict of guilty by adding the phrase "without capital punishment." Act of January 15, 1897, 29 Stat. 487; *see Winston v. United States,* 172 U.S. 303, 312–13, 19 S.Ct. 212, 43 L.Ed. 456 (1899); *see also* Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role,* 26 Fordham Urb. L.J. 347, 366–68 (1999). The movement away from mandatory death sentences was heralded as an "enlightened introduction of flexibility into the sentencing process." *Furman,* 408 U.S. at 402, 92 S.Ct. 2726 (Burger, J. dissenting).

Federal juries retained unlimited and unguided discretion over the imposition of the death penalty in murder cases for three quarters of a century, until the Supreme Court decided *Furman* in 1972. Certiorari was granted in *Furman* to determine whether imposition of the death penalty in the cases of three defendants who were convicted of capital crimes in state courts would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. In a per curiam opinion consisting of one paragraph, the Court held that it would. Five justices filed separate opinions in support of the ruling, as did the four dissenting justices.

Recognizing that the penalty of death is unique among punishments, *Furman*'s multiple opinions have been construed as holding at a minimum that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality op.).

■ Three years after *Furman,* the Supreme Court struck down mandatory

death sentencing entirely, holding that "consideration of the character and record of the individual offender and the circumstances of the particular offense" is a "constitutionally indispensable part" of any capital punishment scheme. *Woodson*, 428 U.S. at 304, 96 S.Ct. 2978 (plurality op.); *see also Roberts v. Louisiana*, 428 U.S. 325, 336, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). These decisions provide the basis for what a majority of the Supreme Court agree are two requirements of a constitutional capital punishment scheme: guiding and limiting the discretion of the sentencing body, and affording that body the opportunity to take into consideration the individual circumstances of the offender and the offense. *See Jones v. United States*, 527 U.S. 373, 381, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

 The sentencing body's discretion must be guided and limited in its "eligibility" determination, deciding whether a defendant has been convicted of a crime for which the death penalty is a "proportionate punishment." *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). At the eligibility stage, the "trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Id.*, 512 U.S. at 971–72, 114 S.Ct. 2630 (citations omitted). The sentencer's "individualized determination" takes place at the "selection stage," "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Id.*, 512 U.S. at 972, 114 S.Ct. 2630.

The *Woodson* plurality emphasized the need overall for heightened reliability in capital proceedings:

[d]eath, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson*, 428 U.S. at 305, 96 S.Ct. 2978. Thus the Supreme Court has invalidated procedures that have "tended to diminish the reliability of the [capital] sentencing determination" on due process grounds. *Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The heightened reliability requirement has resulted in the invalidation of a death sentence where the sentencing body was permitted to consider information in a presentence report that was not made available to defense counsel. *See Gardner*, 430 U.S. at 362, 97 S.Ct. 1197 (Due Process Clause does not allow execution on the basis of information that defendant had no opportunity to deny or explain). It has required that a jury receive a lesser-included offense instruction when the evidence leaves some doubt concerning an element that would justify conviction of a capital offense. *Beck*, 447 U.S. at 637, 100 S.Ct. 2382. It has meant that the prosecution may not create a misimpression in the jury that a defendant could be released on parole if he were not sentenced to death. *See Simmons v. South Carolina*, 512 U.S. 154, 161–62, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

More recently, in *Monge v. California*, 524 U.S. 721, 732, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998), the Court reiterated the "acute need for reliability in capital sentencing proceedings." "The penalty phase of a capital trial is undertaken to assess the gravity of a particular offense and to determine whether it warrants the

ultimate punishment; it is in many respects a continuation of the trial on guilt or innocence of capital murder." *Id.*, 524 U.S. at 731–32, 118 S.Ct. 2246. Despite the Court's repeatedly stressing the need for heightened reliability in capital punishment cases, and that both trial and sentencing process must satisfy the requirements of the Due Process Clause, it has not to date concluded that the "entire panoply of criminal trial procedural rights" are required in a capital sentencing. *Gardner*, 430 U.S. at 358 n. 9, 97 S.Ct. 1197. It has however acknowledged an ongoing "obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society." *Id.* at 357, 97 S.Ct. 1197.

## III. The FDPA

The FDPA states that its procedures apply to "any [federal] offense for which a sentence of death is provided." 18 U.S.C.A. § 3591(a)(2) (West 2000). Under the FDPA, if the government intends to seek the death penalty for a defendant, it must notify him "a reasonable time before trial or before acceptance by the court of a plea of guilty" that it intends to do so. 18 U.S.C.A. § 3593(a)(1). The notice must set forth all aggravating factors that it intends to prove as justifying a sentence of death. § 3593(a)(2).

The FDPA provides that a jury, in determining whether to recommend whether a defendant should be sentenced to death, make three distinct determinations at a "separate sentencing hearing." § 3593(b). In the case of a defendant who has been found guilty of an offense involving homicide, the jury must first find beyond a reasonable doubt that the defendant acted with one of four mental culpability factors, ranging from an intentional killing to intentionally engaging in violence "knowing that the act created a grave risk of death" with the victim's death as a direct result. § 3591(a)(2)(A)-(D).

If one of the mental states is found, the jury must next consider whether the government has proven beyond a reasonable doubt the existence of at least one statutory aggravating factor. § 3593(c), (d). In a homicide case the government must select and prove at least one of sixteen statutory aggravating factors. § 3592(c)(1)-(16). If no statutory aggravating factor is found to exist, then the death penalty shall not be imposed. § 3593(d).

If, however, the two "eligibility" requirements of mental culpability and aggravated homicide are met, then the jury proceeds to the "selection" phase of the hearing, in which it must consider whether all the aggravating factors, both statutory and nonstatutory,[1] found to exist outweigh all mitigating factors, thereby justifying a sentence of death. § 3593(e). The government has the burden of proving the existence of an aggravating factor beyond a reasonable doubt, and the jury's finding must be unanimous. § 3593(c), (d). The defendant has the burden of proving the existence of any mitigating factors by a preponderance of the information, and a mitigating factor may be found by just one or more members of the jury. *Id.* The jury's sentence recommendation must be unanimous. § 3593(e).

The Act provides that information relevant to the sentence, including any mitigating or aggravating factor, "is admissi-

---

1. The FDPA permits the government to seek to prove other aggravating factors not listed in the statute, as long as notice is given to the defendant. 18 U.S.C.A. § 3592(c). These factors do not play a role in the death penalty "eligibility" determination, but may be considered by the jury in its weighing of all circumstances pertaining to the offense, the victim and the offender. § 3592(d), (e).

ble regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." § 3593(c). Both the government and the defendant have an opportunity to rebut any information and to present argument as to the adequacy of the information and the appropriateness of imposing a sentence of death. *Id.*

## IV. The "Element" Versus the "Sentencing Factor"

On June 24 of this year, the Supreme Court declared that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee because it entrusts to the trial judge the determination whether aggravating factors exist that will justify the imposition of the death penalty.[2] *See Ring v. Arizona,* 536 U.S. ——, ——, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002). Applying the holdings from its previous decisions in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Court reasoned as follows. "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones,* 526 U.S. at 243 n. 6, 119 S.Ct. 1215. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a

jury beyond a reasonable doubt." *Apprendi,* 530 U.S. at 482–83, 120 S.Ct. 2348. Thus, "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." *Id.,* 530 U.S. at 495, 120 S.Ct. 2348. Because Arizona's aggravating factors operated as the functional equivalent of an element of the greater offense of capital murder, the Sixth Amendment required that they be found by a jury. *Ring,* —— U.S. at ——, 122 S.Ct. at 2443. Because under Arizona law the trial judge alone was directed to determine the existence or nonexistence of the enumerated aggravating factors, Arizona's capital sentencing scheme violated the Sixth Amendment's guarantee of a right to trial by jury on every element of the offense charged. *Id.*

Over decades the Supreme Court has attempted to define and distinguish the fact as element of the crime from the fact as sentencing factor. A fact that constitutes an element must be charged in an indictment and proven to a jury beyond a reasonable doubt. *See Apprendi,* 530 U.S. at 499–500, 120 S.Ct. 2348 (Thomas, J. concurring). A fair trial of those elements is had if the evidence the jury considers has been introduced consistent with the rules of evidence.

By contrast, a fact that serves to enhance a sentence may be found by the sentencing body, typically a judge, by a lower standard of proof, typically by a preponderance. *See McMillan v. Pennsylvania,* 477 U.S. 79, 91–92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). Sentencing factors may usually be proven by informa-

---

**2.** *Ring* overruled *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which had upheld Arizona's capital sentenc-

ing scheme against Sixth Amendment challenge. *Ring,* —— U.S. at ——, 122 S.Ct. at 2443.

tion that may not meet strict evidentiary standards.

In *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court held that the Due Process Clause requires proof beyond a reasonable doubt "of every fact necessary to constitute the crime with which [a defendant] is charged." The Court did not explain how to determine those necessary facts, however. In *McMillan v. Pennsylvania*, the Supreme Court considered the constitutionality, under the Sixth Amendment's jury trial guarantee and the Due Process Clause, of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Const. Stat. § 9712 (1982). The Pennsylvania statute provided that anyone convicted of certain enumerated felonies was subject to a mandatory minimum sentence of five years' imprisonment if the sentencing judge found, by a preponderance of the evidence, that the person "visibly possessed a firearm" during the commission of the offense. *McMillan*, 477 U.S. at 81, 106 S.Ct. 2411. At issue was whether visible possession of a firearm was an element of the offense that had to be proven beyond a reasonable doubt rather than by a preponderance of the evidence.

The Court concluded no. The state legislature had expressly provided that visible possession of a firearm was not an element of the crime, but a "sentencing factor." [3] *Id.*, 477 U.S. at 85–86, 106 S.Ct. 2411. The Court stressed that a legislature's definition of the elements of an offense is usually dispositive, although it may not transgress constitutional limits. *Id.* The Court identified several features that indicated that Pennsylvania's characterization of visible possession of a firearm as a sentencing

factor was constitutionally permissible. As subsequent cases have demonstrated, the most significant feature was the fact that the statute "neither alter[ed] the maximum penalty for the crime committed nor create[d] a separate offense calling for a separate penalty." *Id.*, 477 U.S. at 87–88, 106 S.Ct. 2411. Using the language of *Winship*, in Pennsylvania's statutory scheme visible possession of a firearm was not a fact necessary to constitute the felony with which the defendant was charged.

In *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Court again considered whether a statute authorizing an enhanced sentence upon a particular factual finding created a separate crime or a sentencing factor. In 8 U.S.C. § 1326(a), Congress defined a crime of illegal reentry by an alien who had been previously deported. Subsection (b)(2) of the statute authorized a prison term of up to twenty years for reentry if the initial deportation had followed a conviction for commission of an "aggravated felony." *Almendarez–Torres*, 523 U.S. at 226, 118 S.Ct. 1219. The Court first ascertained whether subsection (b)(2) was intended to define a separate crime or merely authorize an enhanced penalty by examining "the statute's language, structure, subject matter, context, and history." *Id.*, 523 U.S. at 228, 118 S.Ct. 1219. It concluded that Congress intended to define a sentencing factor. *Id.*, 523 U.S. at 235, 118 S.Ct. 1219.

The Court then considered whether the Constitution required that subsection (b)(2) be treated as having defined a separate offense. *Id.*, 523 U.S. at 239, 118 S.Ct. 1219. It returned to the features it identified in *McMillan*, stated that not all

---

**3.** *McMillan* marked the Supreme Court's first use and approval of the term "sentencing factor." *See* Mark D. Knoll & Richard G. Singer, *Searching for the "Tail of the Dog"*:

*Finding "Elements" of Crimes in the Wake of McMillan v. Pennsylvania,* 22 Seattle U.L.Rev. 1057, 1058 (1999).

must be met for a sentencing factor to comport with the Constitution, and concluded that the sentencing factor at issue—recidivism—need not be treated as an element of the offense. *Id.*, 523 U.S. at 242–47, 118 S.Ct. 1219.[4]

The following term the Court again took up the question whether a federal statute defined separate offenses or separate maximum penalties, in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). The federal carjacking statute, 18 U.S.C. § 2119, as it existed in 1988, set out in three subsections a fifteen year maximum penalty; a 25 year maximum penalty if serious bodily injury resulted; and a maximum penalty of life imprisonment if death resulted. *Jones*, 526 U.S. at 230, 119 S.Ct. 1215.

■ As it did in *Almendarez–Torres*, the Court examined the language and structure of the statute, as well as the subject matter and the history, and concluded that "Congress probably intended serious bodily injury to be an element defining an aggravated form of the crime." *Jones*, 526 U.S. at 234–36, 119 S.Ct. 1215. Recognizing the alternative possibility of viewing the statute as setting forth sentencing factors, the Court employed the doctrine of constitutional avoidance[5] to adopt the interpretation of the statute as setting forth elements of three distinct offenses. *Id.*, 526 U.S. at 239–40, 119 S.Ct. 1215.

In *Jones*, the Court noted, "[i]t is at best questionable whether the specification of facts sufficient to increase a penalty range by two-thirds, let alone from 15 years to life, was meant to carry none of the process safeguards that elements of an offense bring with them for a defendant's benefit." *Id.*, 526 U.S. at 233, 119 S.Ct. 1215. It noted further:

> [i]f a potential penalty might rise from 15 years to life on a nonjury determination, the jury's role would correspondingly shrink from the significance usually carried by determinations of guilt to the relative importance of low-level gatekeeping: in some cases, a jury finding of fact necessary for a maximum 15–year sentence would merely open the door to a judicial finding sufficient for life imprisonment.

*Id.*, 526 U.S. at 243–44, 119 S.Ct. 1215. In a footnote, the Court re-stated its constitutional rule: "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.*, 526 U.S. at 243 n. 6, 119 S.Ct. 1215.

---

4. The Court subsequently suggested that *Almendarez–Torres*'s holding "rested in substantial part on the tradition of regarding recidivism as a sentencing factor, not as an element to be set out in an indictment," in *Jones v. United States*, 526 U.S. 227, 249, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). And in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Court described the case as "a narrow exception to the general rule" that a criminal defendant is entitled to " 'jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " *Id.*, 530 U.S. at 477, 489, 120 S.Ct.

2348 (quoting *United States v. Gaudin*, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)).

5. Under the rule of constitutional avoidance, " 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.' " *Jones*, 526 U.S. at 239, 119 S.Ct. 1215 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)).

The following year the Supreme Court again took up an element versus sentencing factor debate. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), involved a New Jersey statute "hate crime" statute that provided for a lengthier term of imprisonment if a trial judge found, by a preponderance of the evidence, that a defendant committed a crime with a biased purpose, as described in the statute. At issue was whether the Due Process Clause required that such a factual determination be made by a jury on the basis of proof beyond a reasonable doubt. *Id.*, 530 U.S. at 469, 120 S.Ct. 2348. The Court concluded that its holding in *Jones*'s footnote 6 controlled. *Id.* at 490, 120 S.Ct. 2348.

The Court observed that any distinction between an element of a felony offense and a sentencing factor was unknown in the practice of criminal law at the time of the nation's founding, if for no other reason than that trial judges had virtually no sentencing discretion. *See Apprendi*, 530 U.S. at 478–79, 120 S.Ct. 2348. When, as was typical in the 19th and most of the 20th centuries, a statute prescribed a range of punishment, a judge had broad discretion to impose a sentence within those limits. *Id.* at 481–82, 120 S.Ct. 2348. Against this background, the *Apprendi* majority characterized as "novel" a "legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 482–83, 120 S.Ct. 2348 (emphasis in original). In such a scheme, if a "sentencing factor" serves to increase a sentence beyond the maximum sentence otherwise statutorily authorized, "it is the functional

equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." *Id.* at 494 n. 19, 120 S.Ct. 2348.

*Apprendi*'s "elements rule"[6] was extended to capital prosecutions in *Ring*, —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Ring was convicted of felony murder in the course of armed robbery. Under Arizona law he could not be sentenced to the statutory maximum penalty of death unless further factual determinations were made by the sentencing judge concerning the presence or absence of aggravating and mitigating circumstances. Only if the court found at least one statutory aggravating circumstance beyond a reasonable doubt, and no mitigating circumstances "sufficiently substantial to call for leniency," could it impose the death penalty. *Id.*, —— U.S. at —— – ——, 122 S.Ct. at 2434–35.

The judge sentenced Ring to death, and the Arizona Supreme Court upheld the decision. The United States Supreme Court reversed, holding that, under *Apprendi*, "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Id.*, —— U.S. at ——, 122 S.Ct. at 2443 (citation omitted) (quoting *Apprendi*, 530 U.S. at 494, 120 S.Ct. 2348).

On the same day that *Ring* was decided, the Court "[o]nce more ... consider[ed] the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence," in *Harris v. United States*, 536 U.S. ——, ——, 122 S.Ct. 2406, 2410, 153 L.Ed.2d 524 (2002).

---

6. For a more detailed exegesis of the elements rule, see Stephanos Bibas, *Judicial Fact–Finding and Sentence Enhancements in a World of Guilty Pleas*, 110 Yale L.J. 1097, 1123 (2001).

*Harris* reaffirmed *McMillan*, holding that a factual finding that increases a mandatory minimum penalty (although not the maximum penalty) is not an element of a separate offense, and therefore need not be alleged in an indictment, nor proven beyond a reasonable doubt. *See id.,* —— U.S. at ——, 122 S.Ct. at 2420. In a portion of the opinion joined by three other justices, Justice Kennedy wrote, "[r]ead together, *McMillan* and *Apprendi* mean that those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis." *Id.,* —— U.S. at ——, 122 S.Ct. at 2419.

■ *Ring* invalidated the death penalty laws of any jurisdiction that permitted judges to make the findings that would trigger the potential imposition of the death penalty. The FDPA, which requires that these findings be made by a jury, satisfies the Sixth Amendment's jury trial guarantee. *See United States v. Allen,* 247 F.3d 741, 762 (8th Cir.2001), *vacated* —— U.S. ——, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). But the Supreme Court's line of cases that distinguish between elements and sentencing factors, culminating in *Ring*, has implications beyond the "tightly delineated" claim decided there. *Id.,* —— U.S. at —— n. 4, 122 S.Ct. at 2437 n. 4. Essentially, the ongoing judicial debate is an acknowledgment that the line between guilt and punishment has become blurred.

In an era of determinate sentences and limited sentencing discretion, conviction of the offense virtually dictated the sentence, and juries resorted to nullification to mitigate unacceptably harsh punishments. The line between the processes of finding guilt and pronouncing sentence, however, was clear. In an era of indeterminate sentences and virtually unlimited sentencing discretion to arrive at an individualized punishment, the line remained clear: at trial, juries determined whether the elements of a particular offense had been proven beyond a reasonable doubt by admissible evidence; sentencing procedures attempted to ensure that a broad range of information was available to the sentencer, by relaxing the burden of proof and the standards of evidentiary admissibility.

We currently operate in a hybrid era. Under the Sentencing Guidelines in the federal system, sentences are "basically determinate." *United States v. Mistretta,* 488 U.S. 361, 367, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In both capital and non-capital cases, sentencing discretion has been narrowly confined, yet individualized punishment remains an important goal of the criminal justice system. The FDPA prescribes a procedure that must be followed before a sentence of death may be imposed, and it dictates the facts that must be found in order to demonstrate that *Furman* and *Gregg*'s requirements of limited sentencing discretion and individualized determination have been met. The FDPA, in its concern with punishment, looks like a sentencing statute that sets forth sentencing factors.

But in the course of setting forth the procedures for finding facts that will meet the heightened reliability requirements of a capital sentencing scheme, Congress produced a statute in which the death-eligibility factors to an extent resemble elements of a separate capital offense. The Act provides that the government bears the burden of proving the death-eligibility factors to the jury beyond a reasonable doubt. *See* 18 U.S.C.A. § 3593(c). The jury's finding with respect to any aggravating factor must be unanimous. *See* § 3593(d).

The factors resemble elements only to an extent, however. The Act also pre-

scribes that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C.A. § 3593(c). One is thus reminded that these death-eligibility factors are facts to be found at *sentencing,* where, for more than half a century at least, the broadest sources and types of information bearing on punishment have been constitutionally permissible. *See Williams v. New York,* 337 U.S. 241, 246–47, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) (possession of fullest information possible concerning defendant's life and characteristics is highly relevant if not essential at sentencing). Rather than squinting at the formerly clear line between guilt and punishment, when examining the federal death penalty statute it would be better to accept the need for bifocals, and acknowledge that the proceeding it authorizes has both features of a traditional trial and features of a traditional sentencing.[7]

Ultimately, as the government argues, "it is unnecessary to put a definitive label on the FDPA's death-eligibility factors." Mem. in Opp'n at 11 (Doc. 68). Regardless of whether the statutory factors have been labeled, considered or construed as elements or sentencing factors, they must be treated as elements under the authority of *Jones, Apprendi* and *Ring. See Ring,* —— U.S. at ——, 122 S.Ct. at 2444 (Scalia, J. concurring) ("whether the statute calls

them elements of the offense, sentencing factors, or Mary Jane—[they] must be found by the jury beyond a reasonable doubt").

The FDPA's statutory aggravating factors and mental culpability factors expose Fell to a punishment (the death penalty) greater than that otherwise legally prescribed (life imprisonment). *See* 18 U.S.C.A. § 3593(d) (if no aggravating factor set forth in § 3592 is found to exist, court shall impose sentence other than death). In that respect the factors are indistinguishable from the aggravating circumstances found to be " 'the functional equivalent of an element of a greater offense' " in *Ring. Ring,* —— U.S. at ——, 122 S.Ct. at 2441 (quoting *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. 2348); *see also* Nancy J. King & Susan R. Klein, *Essential Elements,* 54 Vand. L.Rev. 1467, 1518 (2001) ("enhancements" in capital cases have now become "elements" in the wake of *Apprendi* ).

## V. Indictment Clause

▆▆▆▆ Although the *Ring* decision explicitly did not discuss whether a defendant was entitled to grand jury indictment on the facts that, if proven, would justify a sentence of death, *see Ring,* —— U.S. at —— n. 4, 122 S.Ct. at 2437 n. 4, the clear implication of the decision, resting as squarely as it does on *Jones,* is that in a federal capital case the Fifth Amendment right to a grand jury indictment will apply. The government in this case implicitly con-

---

**7.** A review of the legislative history of the FDPA reveals no information concerning whether Congress intended to create sentencing factors when it enumerated the mental culpability factors and statutory aggravating factors. In light of the prevailing law at the time however, a wide scope of evidence was allowed in proving *facts* at a *sentencing* hearing. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)

(plurality op.). Section 3593(c)'s requirement of a balancing test for the admission of evidence relevant to the determination of sentence actually operated to strengthen, not to relax capital sentencing standards, to comply with then-current Supreme Court precedent. There is no evidence in the legislative history of the FDPA suggesting that Congress intended to relax evidentiary standards in capital proceedings.

ceded as much when it promptly obtained a superseding indictment that included the mental culpability factors and statutory aggravating factors it intended to prove at trial. It argues that any possible Fifth Amendment challenge to the FDPA has now been eliminated. Fell however contends that because the statute does not provide for indictment of aggravating factors, but specifies the form of notice the government must provide, the statute violates the Fifth Amendment right to grand jury indictment.

■ The Indictment Clause of the Fifth Amendment serves as a check on prosecutorial power, *see United States v. Cotton*, — U.S. —, 122 S.Ct. 1781, 1786–87, 152 L.Ed.2d 860 (2002), and as notice of the charges that must be defended against. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The superseding indictment in this case satisfies the requirements of the Indictment Clause. When it returned a true bill, the grand jury performed its check on prosecutorial power by determining that probable cause exists to find that the specified mental culpability and aggravating factors exist. The superseding indictment informs Fell that he is charged with a capital offense and specifies the factors that, if proven, will render him eligible for a death sentence.

Although the FDPA does not expressly provide for grand jury indictment on the eligibility factors, "nothing in the statute is inconsistent with such a role for the grand jury." *United States v. Church*, — F.Supp.2d —, —, 2002 WL 31004680 at *1 (W.D.Va.2002); *see also United States v. O'Driscoll*, No. 4:CR–10–277, slip op. at 5 (M.D.Pa. Aug. 22, 2002). That the FDPA is silent concerning the grand jury's role in charging death-eligibility factors does not suggest that Congress intended to forbid grand jury participation or to exclude these factors from an indictment. On the contrary, Congress has provided for the grand jury's involvement in charging federal capital offenses in Rule 7 of the Federal Rules of Criminal Procedure: "An offense which may be punished by death shall be prosecuted by indictment.... The indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(a), (c). In line with the holdings of *Jones, Apprendi* and *Ring*, the essential facts of a capital offense must include the mental culpability and statutory aggravating factors specified in the FDPA. That the FDPA prescribes that a defendant receive notice of these factors does not preclude a grand jury's deliberating and voting to indict on these factors. *See United States v. Lentz*, — F.Supp.2d —, —, 2002 WL 2002594 at *7 (E.D.Va.2002).

"[E]very reasonable construction must be resorted to in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895); *see also Salinas v. United States*, 522 U.S. 52, 59–60, 118 S.Ct. 469, 139 L.Ed.2d 352. Because the FDPA does not, by its terms, offend the Indictment Clause, and because the superseding indictment performs its function of providing notice to Fell of every element of the capital offenses with which he is charged, Fell's Fifth Amendment right to grand jury indictment on the factors which render him death-eligible has not been violated.

## VI. Due Process and Confrontation Clauses

Although the Supreme Court's decisions in *Jones, Apprendi* and *Ring* do not put the FDPA on a collision course with the Fifth Amendment's Indictment Clause, they do have profound implications for the Fifth Amendment's Due Process Clause and the Sixth Amendment's guarantees of confrontation and cross-examination.

 That the death-eligibility factors are the functional equivalents of elements, which must be proven to a jury beyond a reasonable doubt, begs the question, what of other fair trial guarantees? The FDPA permits the jury to consider any information relevant to the sentence, subject only to exclusion if the danger of creating unfair prejudice, confusing the issues, or misleading the jury outweighs its probative value. 18 U.S.C.A. § 3593(c). Does this relaxed evidentiary standard withstand due process and Sixth Amendment scrutiny, given the Supreme Court's concern for heightened reliability and procedural safeguards in capital cases, *see, e.g., Ring*, 122 S.Ct. at 2445 (Breyer, J. concurring in judgment) (special procedural safeguards apply when death penalty is sought); *Woodson v. North Carolina*, 428 U.S. 280, 323, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (Rehnquist, J. dissenting) (irreversible nature of death supports provisions for accuracy of fact-finding process and fairness of sentencing procedure), and its holding that facts such as the FDPA's death-eligibility factors are the functional equivalents of elements of a greater offense? *See Ring*, —— U.S. at ——, 122 S.Ct. at 2443. The answer to the question must be "no": using a relaxed evidentiary standard for the determination of death-eligibility factors will not satisfy the demands of due process and the Sixth Amendment rights of confrontation and cross-examination.

The question of the use of a relaxed evidentiary standard to determine death eligibility is particularly compelling in this case. For example, the government maintains that it intends to introduce information at a § 3593 hearing that would not be admissible at Fell's trial. Specifically, in its effort to prove Fell eligible for the death penalty, it intends to produce a statement allegedly made by Fell's deceased co-defendant, Lee, that is potentially critical to the establishment of the death-eligibility factors under the statute. The government concedes that this hearsay statement would not meet any exception to the hearsay rule found in the Federal Rules of Evidence,[8] and that it would not be admissible at the guilt phase of a criminal trial. *See Lilly v. Virginia*, 527 U.S. 116, 128–29, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another); *see also Bruton v. United States*, 391 U.S. 123, 127–28, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

 "[A]s assurance against ancient evils, our country, in order to preserve 'the blessings of liberty', wrote into its basic law the requirement, among others, that the forfeiture of the lives ... of people accused of crime can only follow if procedural safeguards of due process have been obeyed." *Chambers v. Florida*, 309 U.S. 227, 237, 60 S.Ct. 472, 84 L.Ed. 716 (1940). Although the rights of an accused to con-

---

8. Federal Rule of Evidence 804(b)(3) permits the admission of the statement of an unavailable declarant that "so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Although Lee's statement is apparently to some degree inculpatory, its effect is to suggest that Fell is far more culpable than he.

front and cross-examine witnesses [9] are set forth in the Sixth, not the Fifth Amendment, "[t]he rights to confront and cross-examine witnesses ... have long been recognized as essential to due process." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Indeed, "the absence of proper confrontation at trial 'calls into question the ultimate integrity of the fact-finding process.'" *Ohio v. Roberts,* 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting *Chambers,* 410 U.S. at 295, 93 S.Ct. 1038) (internal quotation omitted).

The Sixth Amendment does not operate to exclude all hearsay, of course. In order for hearsay to be admissible in conformity with the Sixth Amendment, the proponent of the hearsay must demonstrate necessity (such as the unavailability of the declarant) and trustworthiness. *See Roberts,* 448 U.S. at 65–66, 100 S.Ct. 2531; *see also Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (central concern of Confrontation Clause is to ensure reliability of evidence against a criminal defendant by subjecting it to rigorous testing in context of adversary proceeding before trier of fact); *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969) (per curiam) (important object of right of confrontation was to guarantee that fact finder had adequate opportunity to assess credibility of witness).

A hearsay statement will be considered sufficiently dependable to be admitted against an accused when it "falls within a firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Lilly,* 527 U.S. at 124–25, 119 S.Ct. 1887 (1999). An accomplice's confession that incriminates a defendant does not fall within a firmly rooted hearsay exception, and is presumptively unreliable. *See id.,* 527 U.S. at 131, 134, 119 S.Ct. 1887; *see also Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (truthfinding function of Confrontation Clause is uniquely threatened when accomplice's confession is sought to be introduced against criminal defendant without benefit of cross-examination, due to accomplice's motivation to implicate defendant and exonerate himself).

Although the Supreme Court has determined that the Due Process Clause applies to some extent at sentencing proceedings, *see Gardner,* 430 U.S. at 358, 97 S.Ct. 1197, the Court has not yet decided whether the Sixth Amendment's Confrontation Clause applies. That the text of the Amendment refers to "all criminal prosecutions" would suggest that the rights enumerated there are not confined to trial. The Sixth Amendment rights to notice and counsel are required at all critical stages of a criminal proceeding, including sentencing, *see Mempa v. Rhay,* 389 U.S. 128, 134, 137, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), which at the time the Sixth Amendment was adopted took place immediately following the trial.

The question, however, should not be viewed as one strictly of form—what due process or fair trial rights are required at sentencing—but of function—what rights are required at a proceeding at which facts are found that equate to offense elements? The Supreme Court held in *Williams v. New York,* 337 U.S. 241, 249–50, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), that in the then-modern era of indeterminate sentences, the Due Process Clause did not demand that a defendant have the oppor-

---

9. The Sixth Amendment's guarantee of the right of an accused to be confronted with the witnesses against him includes the right of cross-examination. *See Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

tunity to confront and cross-examine the witnesses brought against him. That broad holding was narrowed somewhat in *Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), when the Court refused to extend *Williams* to "radically different" sentencing proceedings. *Specht* had been convicted of indecent liberties under a Colorado statute that carried a maximum sentence of ten years. *Id.,* 386 U.S. at 607, 87 S.Ct. 1209. He was sentenced under the state's Sex Offenders Act to an indeterminate term of from one day to life imprisonment. *Id.* The Court noted that the Sex Offenders Act made "one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact that was not an ingredient of the offense charged." *Id.* at 608, 87 S.Ct. 1209 (internal citation omitted). Because the sentencing body was called upon to determine an issue that was separate from those decided at trial, due process gave Specht a right to be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, cross-examine the witnesses and offer evidence of his own. *See id.* at 610, 87 S.Ct. 1209.

In *Gardner,* the Supreme Court discussed *Williams,* observing that "Justice Black's opinion recognized that the passage of time justifies a re-examination of capital-sentencing procedures." *Id.,* 430 U.S. at 356, 97 S.Ct. 1197. The Court concluded that the Due Process Clause required the disclosure of information which might support a death sentence, along with an opportunity to deny or explain it. *Id.* at 362, 97 S.Ct. 1197.

In *Bullington v. Missouri,* 451 U.S. 430, 446, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the Supreme Court held that because Missouri's bifurcated capital sentencing proceeding was like a trial, the Double Jeopardy Clause prevented retrial on the imposition of the death penalty following the jury's recommendation of a life sentence. The Court described Missouri's scheme as requiring a separate post-trial hearing before the trial jury, notice to the defendant of aggravating factors, a jury determination of the existence of any statutory aggravating or mitigating factors, weighing of those factors, and a determination beyond a reasonable doubt that any aggravating circumstances warrant the imposition of the death penalty. *See id.* at 433–34, 101 S.Ct. 1852. This statutory scheme, virtually identical to the FDPA, "resembles a trial on the issue of guilt or innocence," according to the Court. *Id.* at 444, 101 S.Ct. 1852. The Court implied that such a sentencing hearing was sufficiently similar to the hearing described in *Specht* that *Specht*'s due process protections would apply. *See id.,* 451 U.S. at 446, 101 S.Ct. 1852. If Missouri's capital sentencing scheme is sufficiently different from the indeterminate sentencing hearing to warrant due process protections outlined in *Specht,* then the FDPA, indistinguishable from Missouri's statute in any meaningful way, warrants the same due process protections.

The FDPA's procedure for determining death eligibility defies labeling either as sentencing or as trial. Congress categorized it as part of the sentencing process, *see* §§ 3591–3594, but in reality the FDPA has separated the determination of guilt of a capital offense into two adversarial factfinding proceedings, one to determine guilt of the underlying offense, followed by one to determine guilt of the capital offense. This second determination is sufficiently like a trial, "a trial on the issue of punishment", *see Bullington,* 451 U.S. at 438, 101 S.Ct. 1852, that trial rights must be con-

strued to protect and enhance the reliability of the death-eligibility fact-finding process. Given the unique and momentous interest at stake—the death-eligibility determination is the stage at which the penalty of life imprisonment can be converted to a death sentence—procedural rights that will ensure the highest degree of reliability in the fact-finding process are imperative. *See Woodson,* 428 U.S. at 304–05, 96 S.Ct. 2978 (because of the qualitative difference of the penalty of death, there is a corresponding difference in the need for reliability that death is the appropriate punishment).

■ Every crime set forth in the United States Code is defined in terms of elements, and every element must not only be proven to a jury beyond a reasonable doubt, but be proven by evidence found to be reliable by application of the Federal Rules of Evidence. After *Apprendi* was decided, federal courts concluded that if drug type and quantity is used in a 21 U.S.C. § 841 prosecution to impose a sentence beyond the statutory maximum for an indeterminate quantity of drugs, then it is an element of the offense that must be charged in an indictment and submitted to the jury. *See, e.g., United States v. Thomas,* 274 F.3d 655, 660 (2d Cir.2001) (en banc). As the government notes, indictments now routinely allege drug quantity, and facial challenges to § 841 have been rejected. Mem. in Opp'n at 19 (Doc. 68); *see, e.g., United States v. Outen,* 286 F.3d 622, 634 (2d Cir.2002) (collecting cases). The evidentiary standards of course are the same for these judicially-recognized elements as for any other element of an offense.

The government is content with the notion that a relaxed evidentiary standard continues to be appropriate for every aspect of the capital sentencing process, despite *Ring*'s holding that death-eligibility

factors "operate as 'the functional equivalent of an element of a greater offense.'" *Ring,* —— U.S. at ——, 122 S.Ct. at 2441, (quoting *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. 2348). In effect, the government would approve death eligibility as the federal criminal justice system's sole exception to the practice of requiring that offense elements be proven by admissible evidence comporting with due process and fair trial guarantees. This makes no sense.

When Congress enacted the FDPA it could not have anticipated that death-eligibility factors would be regarded as the functional equivalent of elements. Consequently it specified an evidentiary standard and a burden of proof it undoubtedly thought would provide more procedural protection than the usual sentencing proceeding. *See United States v. Allen,* 247 F.3d 741, 759–60 (8th Cir.2001) (relaxed evidentiary standard works to defendant's advantage in helping to prove mitigating factors and to disprove aggravating factors, rejecting facial challenge to FDPA's relaxed evidentiary standard), *vacated by* —— U.S. ——, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). Courts are able to try and sentence 21 U.S.C. § 841 offenders without offending the Constitution because the statute's silence is not inconsistent with treating drug type and quantity as an element to be tried and proven to a jury beyond a reasonable doubt and on the basis of admissible evidence. *See United States v. McAllister,* 272 F.3d 228, 233 (4th Cir.2001). Section 3593(c) is not silent however; its relaxed evidentiary standard requirement is inconsistent with treating the death-eligibility factors as elements.

■ Congress has the power to prescribe what evidence is to be received in the courts of the United States, *Tot v. United States,* 319 U.S. 463, 467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), consistent with

the commands of the Constitution. The Due Process Clause sets limits upon that Congressional power, however. *See id.* "Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard [persons] from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." *Brinegar v. United States,* 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

■ The full panoply of criminal trial rights may not be appropriate at all phases of a capital sentencing, given the mandate to fashion an individualized sentence, based on a broad range of information. But recognition that the death-eligibility factors are the functional equivalents of elements of the capital offense necessitates recognition that the fundamental rights of confrontation and cross-examination and an evidentiary standard consistent with the adversarial nature of the proceeding must be afforded in the death-eligibility determination.

■ Congress has explicitly and unambiguously provided that the Federal Rules of Evidence do not apply in § 3593 hearings, and thus by necessary implication that a defendant does not have confrontation or cross-examination rights at a capital sentencing proceeding. This is not a situation where a Constitutional question can be avoided by adopting one of two plausible constructions. *Cf. Jones,* 526 U.S. at 239–40, 119 S.Ct. 1215. This is not a situation where the Court can correct a gap or a Congressional oversight, can

state, in effect, if Congress had known that the death-eligibility factors were the functional equivalent of elements, Congress would have ensured that the rules of evidence applied. Given the fact that Congress has spoken on the issue, the Court is not permitted to fashion its own evidentiary rules for the eligibility portion of a capital sentencing proceeding in defiance of the Congressional mandate. The FDPA "cannot be saved by judicial reconstruction." *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

■ The task of designing a constitutional capital sentencing scheme is the task of legislatures, not judges.

" [T]he Bill of Rights safeguards ... are the very vitals of a sound constitutional legal system designed to protect and safeguard the most cherished liberties of a free people. These safeguards were written into our Constitution not by judges but by Constitution makers. Freedom in this Nation will be far less secure the very moment that it is decided that judges can determine which of these safeguards 'should' or 'should not be imposed.' "

*In re Gault,* 387 U.S. 1, 62–63, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (Black, J. concurring).

■ The Court concludes that the FDPA, which bases a finding of eligibility for imposition of the death penalty on information that is not subject to the Sixth Amendment's guarantees of confrontation and cross-examination, nor to rules of evidentiary admissibility guaranteed by the Due Process Clause to fact-finding involving offense elements, is unconstitutional.[10]

10. The evidentiary standard portion of the statute is not severable. In evaluating severability the question "is whether the statute

will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 685, 107 S.Ct. 1476, 94

## VII. Conclusion

The *Jones, Apprendi, Ring* trilogy forces the examination of the death-eligibility determination in a new light. Congress has provided that such fundamental safeguards as the right to notice, to a unanimous jury determination, and to proof beyond a reasonable doubt apply to the mental culpability and statutory aggravating factors that would justify the imposition of a sentence of death. The Supreme Court has instructed that these factors are the functional equivalents of elements of a capital offense.

The instant case raises the next issue implicated by the *Apprendi–Ring* logic: what other fundamental safeguards are affected by the new understanding of these factors as the functional equivalents of elements? This Court must respond that because these factors are the functional equivalents of elements of a capital offense, a defendant is entitled, under the Due Process Clause and the Sixth Amendment, to confront and cross-examine adverse witnesses, and to require that these facts be proven by admissible evidence. Otherwise, the death-eligibility determination factors would stand alone as the only elements of any federal criminal offense that can be proven under a relaxed evidentiary standard, one that would even condone the use of unreliable hearsay.

When Congress enacted the FDPA, it could not have anticipated that death-eligibility factors would be regarded as the functional equivalent of elements. Consequently it specified an evidentiary standard and a burden of proof it undoubtedly thought would provide more procedural protection than offered in the usual sentencing proceeding. It is inconceivable to this Court that Congress could have intended instead to provide less protection in a capital proceeding than in a non-capital proceeding to the factual determination of an essential element of an offense.

The Apprendi–*Ring* decisions command this result. *Apprendi*'s "constitutional protection[ ] of surpassing importance: the proscription of any deprivation of liberty without due process of law," *see Apprendi*, 530 U.S. at 476, 120 S.Ct. 2348 (citation and internal quotation marks omitted), is a flimsy shield if notice and the government's reasonable doubt burden are shackled to proof by unreliable and otherwise untested evidence.

Capital punishment is under siege. Justice Breyer has recently observed "the continued difficulty of justifying capital punishment in terms of its ability to deter crime, to incapacitate offenders, or to rehabilitate criminals." *Ring*, —— U.S. at ——, 122 S.Ct. at 2446 (Breyer, J. concurring); *see also United States v. Quinones*, 196 F.Supp.2d 416, 420 (S.D.N.Y. 2002)("[w]e now know, in a way almost unthinkable even a decade ago, that our system of criminal justice, for all its protections, is sufficiently fallible that innocent people are convicted of capital crimes with some frequency"). Congress is charged with the responsibility of deciding

---

L.Ed.2d 661 (1987). The unconstitutionality of a part of an act does not necessarily mean that the entire law is unconstitutional; "the invalid part may be dropped, if what is left is fully operative as a law." *United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

Unlike the clause at issue in *Jackson*, however, the evidentiary standard portion of the FDPA is not "functionally independent." *Id.*,

390 U.S. at 586, 88 S.Ct. 1209. Without this portion of the statute the basic operation of the FDPA is substantially altered. *See id.* As an integral part of the FDPA's death penalty sentencing scheme, the relaxed evidentiary standard provision is so intertwined with the remainder of the statute that the Court would have to rewrite the law in order for it to operate.

whether capital punishment is a part of our federal law. If capital punishment is to be a part of our federal law, Congress must also determine the procedure by which the death penalty is to be imposed, consistent with Constitutional standards. Courts cannot, and should not, rewrite an unambiguous Congressional directive regarding this process.

■ If the death penalty is to be part of our system of justice, due process of law and the fair-trial guarantees of the Sixth Amendment require that standards and safeguards governing the kinds of evidence juries may consider must be rigorous, and constitutional rights and liberties scrupulously protected. To relax those standards invites abuse, and significantly undermines the reliability of decisions to impose the death penalty.

Accordingly, the Supplemental Notice of Intent (Doc. 58) is hereby dismissed. The Notice of Special Findings in the Superseding Indictment (Doc. 57) is hereby stricken.