**UNITED STATES of America**

v.

**Gary Lee SAMPSON**

**No. 01–10384–MLW.**

United States District Court,
D. Massachusetts.

Aug. 26, 2004.

David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, Robert L. Sheketoff, for Gary Lee Sampson (1), Defendants.

Frank M. Gaziano, United States Attorney's Office, George W. Vien, United States Attorney's Office, John A. Wortmann, Jr., United States Attorney's Office, Boston, for USA, Plaintiff.

### MEMORANDUM AND ORDER CONCERNING POST–TRIAL MOTIONS

WOLF, District Judge.

This memorandum is based on the transcript of the decisions rendered orally on January 26, 2004, in which the court denied defendant Gary Sampson's various post-trial motions and renewed challenges to the sufficiency of the evidence. This memorandum adds some citations, clarifies some language, expands some discussion, and deletes some colloquies between the court and counsel.

\* \* \* \* \* \*

### I. MOTION FOR A NEW TRIAL, OR, IN THE ALTERNATIVE, FOR A HEARING BASED ON POST–VERDICT STATEMENTS BY JURORS

For the reasons described below, the court is denying the defendant's motion for a new penalty phase trial or for a hearing at which jurors will be questioned about their deliberative process.

The motion relates to press reports of post-verdict statements made by one of the deliberating jurors, Wendy Putnam. The defendant seeks a new penalty phase trial, arguing that these statements reveal a fundamental misunderstanding of the court's instructions. He states that in the event that the court "is not satisfied to proceed on the basis of the statements attributed to Ms. Putnam ... a hearing is specifically requested at which all deliber-

ating jurors will be directed to appear and to respond to questions concerning the legal standard that was applied by the jury on the issue of mental health and whether Ms. Putnam's observations are accurate." Def.'s Mot. at 4.

This is primarily a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. This motion was timely filed on January 9, 2004, the time prescribed for the filing of such motions by the December 23, 2003 Order. *See* Fed. R.Crim.P. 33(b)(2).

Rule 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The government has acknowledged that Rule 33 applies generally in this case to the penalty phase of the trial that the court conducted. *See* Govt.'s Resp. to the Court's June 16, 2003 Order at 2.

The government contends that both Federal Rule of Evidence 606(b) and the common law on which it is based prohibit any inquiry into the jurors' deliberative process or consideration by the court of the jurors' extrajudicial statements concerning that process. The government further argues that there is no evidence or information properly before the court to justify any of the relief sought.

The court agrees that Ms. Putnam's reported statements do not justify either questioning of the jurors or a new trial.

The defendant focuses the court's attention on the following press reports. A December 31, 2003 *Boston Herald* article reports that the following statements were made by Ms. Putnam:

> After hearing the prosecution psychiatrist testify, Putnam said she could not accept defense claims that Sampson couldn't control himself once he embarked on the six-day killing spree.

> "It went back to him knowing the difference between right and wrong," Putnam said, "and that was the fulcrum on which everything else balanced. He was able to know the difference, and he was able to control himself. He could have done differently."

J.M. Lawrence, "Jurors Still Wondering What Made Sampson Kill," *Boston Herald*, Dec. 31, 2003, at 14.

In addition, another article published on December 31, 2003 reports that Ms. Putnam said:

> He knew right from wrong—he said that himself in his confession—and that was said by almost every single mental health professional, and that's what we based our decision on.

Denise Lavoie, "Sampson Jurors Say Multiple Killings Made Death Appropriate Punishment," *Assoc. Press Wire Svc.*, Dec. 31, 2003.

The defendant contends that these statements show that the jury did not understand or follow the court's instructions regarding impaired capacity and mental illness. Thus, the defendant asserts that he was unlawfully convicted and should receive a new trial.

It is, however, not permissible or appropriate for the court to consider Ms. Putnam's reported statements. In addition, even if they are considered, along with the reported statements of other jurors, they do not justify an evidentiary hearing or a new trial.

Federal Rule of Evidence 606(b) applies to this proceeding and prohibits the introduction of evidence concerning the jurors' deliberative process. It states that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything

upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

■ Ms. Putnam's statements are the type excluded by the rule. As the Fifth Circuit has stated: "Rule 606(b) has consistently been used to bar testimony when [it is alleged that] the jury misunderstood [the] instructions." *United States v. Jones,* 132 F.3d 232, 245 (5th Cir.1998). In *Jones,* the Fifth Circuit held that Rule 606(b) applies and precludes consideration of affidavits indicating the jurors were confused by the court's instructions in the penalty phase of a Federal Death Penalty Act case. *See* 132 F.3d at 245. Other federal courts have also applied Rule 606(b) to issues arising in Federal Death Penalty Act cases. *See United States v. Battle,* 264 F.Supp.2d 1088, 1191–93 (N.D.Ga.2003); *United States v. Chandler,* 950 F.Supp. 1545, 1579 (N.D.Ala.1996); *United States v. McVeigh,* 118 F.Supp.2d 1137, 1152 (D.Colo.2000); *United States v. McVeigh,* 153 F.3d 1166, 1186 (10th Cir. 1998). In addition, a 1972 Advisory Committee note concerning Rule 606(b) indicates that the Rule is intended to exclude testimony and affidavits of jurors when it is claimed that they misinterpreted instructions on the law. *See* Fed.R.Evid. 606 Advisory Committee's Notes to 1972 Proposed Rules ("[T]estimony or affidavits of jurors have been held incompetent to

show ... misinterpretation of instructions.").

This court agrees that Rule 606(b) applies to the instant motion. Rule 1101(b) states that the Federal Rules of Evidence apply generally to criminal cases and proceedings. Pursuant to Rule 1101(d)(3), the Rules do not apply to certain miscellaneous criminal proceedings, including sentencings. However, the present proceeding is a hearing on a motion for a new trial, not a sentencing hearing.

More significantly, Rule 1101 does not directly address the unique nature of the proceedings to determine the sentence in capital cases, which involve a jury trial. All of the purposes served by Rule 606(b) as applied to a conventional criminal trial are also served by applying the Rule in the present circumstances.

Contrary to the defendant's contention, the Federal Death Penalty Act does not state that the Federal Rules of Evidence are wholly inapplicable in federal capital cases. 18 U.S.C. § 3593(c), on which the defendant relies, is captioned, "Proof of mitigating and aggravating factors." It states, in pertinent part, that in the penalty phase of a Federal Death Penalty Act case, "[i]nformation is admissible regardless of its admissibility under the rules governing the admission of evidence at criminal trials." Rule 606(b) is not a rule that determines what evidence is admissible at trial. Rather, it is captioned, "Inquiry into validity of verdict or indictment." It addresses what information may be introduced and considered after a trial has been completed.

The conclusion that Rule 606(b) applies is not qualified by the fact that the Supreme Court has often stated that "death is different" and the Eighth Amendment requires procedures to ensure heightened reliability when the death sentence is im-

posed. *See Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring); *Ring v. Arizona,* 536 U.S. 584, 605–06, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Harmelin v. Michigan,* 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Mills v. Maryland,* 486 U.S. 367, 383–84, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion); *Simmons v. South Carolina,* 512 U.S. 154, 172, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (Souter, J., concurring).

The Supreme Court in *Tanner v. United States,* 483 U.S. 107, 120–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) stated that, generally, full and frank discussions in the jury room and jurors' willingness to return an unpopular verdict would be undermined by a barrage of post-verdict scrutiny of juror conduct. *See also United States v. Connolly,* 341 F.3d 16, 34 (1st Cir.2003); *Plummer v. Springfield Terminal Railway Co.,* 5 F.3d 1, 2 (1st Cir.1993). Promoting full and frank discussion and protecting jurors from fear that they would be subject to scrutiny if they return unpopular verdicts are also important concerns in capital cases. To this degree, Rule 606(b) generally promotes, rather than undermines, the reliability of verdicts in capital cases. That was the holding of *Jones,* 132 F.3d at 246.

This court agrees with the conclusion reached in *Jones,* but not all of the reasoning. In reaching the conclusion that Rule 606(b) promotes rather than undermines the reliability of verdicts in capital cases, this court has focused exclusively on the value of promoting full and frank discus-

sion and protecting jurors from fear of post-verdict scrutiny for what may be an unpopular decision. This court has given no weight to the interest of finality, which is another reason for Rule 606(b), and a reason that may have been relied upon by the Fifth Circuit in Jones. *See* 1974 Advisory Committee Note to Rule 606(b) ("Public policy requires finality to litigation:"); *Jones,* 132 F.3d at 246 ("We will not allow a juror to change his mind after the jury has rendered a verdict."); *accord Connolly,* 341 F.3d at 34 ("There are significant policy considerations underlying [Rule 606(b) ], including finality . . .").

· The interest of finality served by Rule 606(b) may arguably be in tension with the interest of procedures to assure heightened reliability in capital cases. However, applying Rule 606(b) was at least implicitly found to be consistent with the requirement of heightened reliability in the other Federal Death Penalty Act cases cited earlier. It has also been employed by federal courts in analyzing state convictions in proceedings pursuant to 28 U.S.C. § 2254. *See Fullwood v. Lee,* 290 F.3d 663, 679–80 (4th Cir.2002); *Gosier v. Welborn,* 175 F.3d 504, 510–11 (7th Cir.1999); *McDowell v. Calderon,* 107 F.3d 1351, 1367–68 (9th Cir.1997); *Dobbs v. Zant,* 963 F.2d 1403, 1411–12 (11th Cir.1991), *rev'd on other grounds,* 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993); *Silagy v. Peters,* 905 F.2d 986, 1008–09 (7th Cir.1990). This court also finds that application of Rule 606(b) in post-trial proceedings in Federal Death Penalty Act prosecutions is consistent with the need for heightened reliability in capital cases.

If the Federal Rules of Evidence did not apply, the common law would dictate the same result in this case. The First Circuit recently wrote that, "Federal Rule of Evidence 606(b) codifies the 'near-universal and firmly established common-law rule'

that prohibits the admission of juror testimony to impeach a jury verdict." *Connolly,* 341 F.3d at 34 (quoting *Tanner,* 483 U.S. at 117, 107 S.Ct. 2739). Therefore, the result would be the same if the common law, rather than the Federal Rules of Evidence, were applicable to the pending motion for a new sentencing trial.

■ Moreover, even assuming that the court had the discretion to grant the requested hearing, the defendant has not made a sufficient showing to justify the questioning of the jurors about their deliberative process. Even when there is an allegation that extraneous prejudicial information is brought to the jury's attention, "[a] court should only conduct such an inquiry when 'reasonable grounds for investigation exist,' *i.e.,* 'there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.'" *Connolly,* 341 F.3d at 34 (quoting *United States v. Moon,* 718 F.2d 1210, 1234 (2d Cir.1983)).

The relevant information in this case does not meet this standard. Nor does that information suffice if the lower general good cause standard is used.

In this case, the defendant does not allege that the jury was improperly instructed. At the time those instructions were given, the defendant did not object to the instruction regarding mental illness or significant impairment.

The government expressed concern on December 17, 2003 that the proposed instruction on mental illness was too generous to the defendant. However, the government did not object to the instruction when it was given to the jury on December 19, 2003.

The jurors had the transcript of the instructions. The jurors did not request any clarification of the instructions, despite being encouraged to do so by the court if they were confused. The jurors addressed all of the appropriate questions on the verdict forms. Their verdicts found some but not all of the government's alleged aggravating factors to be proven. The jurors also found some but not all of the defendant's mitigating factors to be proven.

Not one juror found that the defendant proved that he had a mental illness or that he was significantly impaired at the time he committed the two crimes at issue in this case. The defendant did offer a great deal of evidence on these issues. However, the government very effectively cross-examined the defendant's witnesses. The government's expert, Dr. Michael Welner, in effect testified that the defendant did not have a mental illness which significantly impaired him. The jury was entitled to judge credibility and it was entitled not to be persuaded by the defendant's evidence.

■ Where, as here, the court is deciding a Rule 33 motion for a new trial, it may, and indeed must, consider its own evaluation of the credibility of the evidence and it may, in certain, limited circumstances, grant a new trial if it disagrees with the jury's judgment. *See United States v. Wilkerson,* 251 F.3d 273, 278 (1st Cir.2001) (quoting *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir.1979)); *United States v. Montilla–Rivera,* 115 F.3d 1060, 1067 (1st Cir.1997); *United States v. Ferguson,* 246 F.3d 129, 133–34 (2d Cir.2001); *United States v. Woolfolk,* 197 F.3d 900, 907–08 (7th Cir.1999) (Ripple, J., dissenting). In this case, if the decision were to be made by the court rather than the jury, the court would have found that Sampson at least had a mental illness, bipolar disorder. However, "[t]he remedy of a new trial is rarely used; it is warranted only where there would be a

miscarriage of justice or where the evidence preponderates heavily against the verdict." *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir.1996) (internal quotation marks omitted). In *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir.1986), the First Circuit wrote that it "ha[d] emphatically stated that a trial judge is not a thirteenth juror," and that he may not "set aside a verdict merely because he would have reached a different result."

In this case, the court's difference of opinion with the jury is only with regard to at least one mitigating factor relating to mental illness. In essence, the court finds that the defendant's expert, Dr. Angela Hegarty, was more credible with regard to the defendant being bipolar than the government's expert, Dr. Welner. The court does not, however, find that the evidence on this issue predominates heavily in favor of the defendant being found to be bipolar. In the circumstances, it is not appropriate for the court to disregard the jury's decision on the mitigating factor of mental illness. *See Wilkerson*, 251 F.3d at 278; *Andrade*, 94 F.3d at 9.

In any event, the court does not find that the overall verdict was heavily against the weight of the evidence. There was ample evidence for the jury to find that the proven aggravating factors sufficiently outweighed the proven mitigating factors to make death the appropriate penalty. It is not a miscarriage of justice to let the verdict stand and to deny the request for a new trial.

In the interest of completeness, however, the court adds the following. As the four articles marked as exhibits 3A to D today indicate, Ms. Putnam was not the only juror quoted in the media. The defendant does not claim that the reported comments of other jurors suggest that they did not follow the court's instructions.

To the contrary, the forewoman, Mary Dever, was quoted as saying in the December 24, 2003 *Boston Globe:* "We would have gladly found that [Sampson] was mentally ill, if we felt the proof was there.... We all looked for it. It just wasn't there." John Ellement, "Deliberations Called Careful, Methodical," *Boston Globe*, Dec. 24, 2003, at B7. The court recognizes that this statement does not directly address whether the jurors understood and properly applied the court's instruction on what constituted mental illness. It does, however, indicate that they took the issue of mental illness seriously.

In this context, Ms. Putnam's reported statements do not raise a substantial question of whether the jury followed the court's instructions. As defense counsel rightly observed, they are hearsay, and it is not clear if the quotes attributed to her are accurate. *See* Jan. 26, 2004 Tr. at 7–9. In any event, the quotes are probably not a complete statement of all she said, and they are not clarified by being placed in any context.

Most significant, even in isolation, Ms. Putnam's statements did not indicate that the jury necessarily failed to follow the court's instructions. The first statement in the Lawrence article is that after hearing the prosecution psychiatrist testify, Ms. Putnam said she could not accept defense claims that Sampson could not control himself once he embarked on the six-day killing spree. This only indicates that she was persuaded by the government's expert that Sampson was not significantly impaired. It was permissible for her to reach this conclusion. The second reported statement by Ms. Putnam in the Lawrence article was: "It went back to him knowing the difference between right and wrong. That was the fulcrum on which everything else balanced. He was able to know the difference. He was able to con-

trol himself. He could have done differently." The reference to balancing suggests that Ms. Putnam was talking about the weighing decision rather than the special findings regarding particular alleged mitigating factors.

The jury was entitled to reason as follows. Sampson killed three people, not one. Each killing involved in this case was especially heinous, cruel, and depraved. With regard to mitigating factors, Sampson did not claim, let alone prove, that his ability to distinguish right from wrong was significantly impaired. Sampson did not prove that his ability to control himself and to conform his conduct to the requirements of the law was significantly impaired. Nor did he prove to the jury that he suffered any mental illness. In these circumstances, the jury was entitled to decide that in the absence of any mitigating factor regarding mental condition, the aggravating factors sufficiently outweighed the mitigating factors to justify the death penalty.

The third statement that the defendant focuses on was in the December 31, 2003 Associated Press article. It is the statement that: " 'He knew right from wrong. He said that himself in his confession, and that was said by almost every single mental health professional, and that's what we based our decision on,' Putnam said." This statement, too, may relate to the weighing process rather than to the process of deciding whether any of the mitigating factors relating to mental illness had been proven.

Therefore, even if the court could properly consider the statements attributed to Ms. Putnam in the context of other jurors' reported comments and other relevant facts, those statements would not, as the defendant argues, demonstrate or sufficiently indicate that the jury misunderstood the court's instructions regarding the role of mental health and, instead, substituted its own concept of mental illness as a mitigating factor.

In view of the factors weighing against permitting jurors to be interrogated after they return a verdict, particularly the value of confidentiality to promote frank discussions and to protect jurors from harassment or the fear of harassment if they cast unpopular votes, no further hearing is appropriate.

It is also not appropriate to grant a new trial because of Ms. Putnam's reported statements. There is no evidence properly before the court that the jurors failed to follow the court's instructions on mental illness. The evidence did not heavily predominate against the finding of no significant impairment, no severe mental or emotional distress, and no mental illness. In addition, the information presented does not persuade the court that a miscarriage of justice will occur if a new trial is not granted.

## II. CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

The court did not rule on the defendant's renewed Rule 29 motion before the jury returned its verdicts.[1] The parties

---

1. The court and the parties have frequently referred to the defendant's motions challenging the sufficiency of the government's evidence to prove various aggravating factors as "Rule 29" motions. *See* Fed.R.Crim.P. 29. Rule 29 relates to motions for a "judgment of acquittal." *Id.* Thus, it may not apply in the penalty phase of an FDPA prosecution. However, the parties in this case agreed that even if Rule 29 is inapplicable, the court has Rule 29–like powers to strike aggravating factors that are not supported by sufficient evidence and should apply Rule 29 standards in considering challenges to the sufficiency of the government's evidence. *See United States v. Sampson,* 01–10384–MLW, slip op. at 58–67,

agreed that the court would have the power to do that after the jury returned its verdicts, if it was necessary. The jury's verdicts mooted some of the issues, but not all of them. With respect to the remaining issues, once again, the court is denying the Rule 29 motion.

The standards are as the court explained them at some length orally on November 24, 2003 and they are fully stated in the Memorandum memorializing some of the decisions made during trial. *See United States v. Sampson,* 01–10384–MLW, slip op. at 65–67, 2004 WL 1906872, 335 F.Supp.2d 166, 202–03 (D.Mass. Aug. 26, 2004). The same standards are being applied here.

The motion challenges the sufficiency of the evidence for certain alleged aggravating factors. At the close of the government's case in chief, the court allowed the original Rule 29 motion, in part. The court held that there was insufficient evidence for the jury to find beyond a reasonable doubt that Philip McCloskey or Jonathan Rizzo was tortured, that Mr. McCloskey was vulnerable due to age as opposed to infirmity, and that there was substantial planning and premeditation with regard to the killing of Mr. McCloskey. Prior to submitting the case to the jury, the court also eliminated as an element of an aggravating factor one of the bank robberies committed by Sampson because the stipulated evidence demonstrated that it was not an armed bank robbery.

The jury's verdicts render moot two other issues. For both counts, the jury found that the government had not proven future dangerousness in prison beyond a reasonable doubt. The jury also found that obstruction of justice was not proven for either count.

2004 WL 1906872, 335 F.Supp.2d 166, 198–

Most if not all of the evidence that the defendant presented regarding aggravating factors addressed the issue of future dangerousness, which is now moot. The jury was entitled not to believe the evidence that the defendant presented as it related to the remaining aggravating factors. Therefore, the evidence on those remaining aggravating factors, the aggravating factors that the jury weighed in reaching its verdicts, is as it was at the end of the government's case in chief.

For the reasons stated previously, that evidence, viewed in the light most favorable to the government, was sufficient to prove beyond a reasonable doubt the especially heinous, cruel, and depraved aggravating factors regarding the murders of both Mr. McCloskey and Mr. Rizzo, and the contention that Mr. McCloskey was particularly vulnerable due to infirmity as well. *See United States v. Sampson,* 01–10384–MLW, slip op. at 79–81, 91, 96–97, 2004 WL 1906872, 335 F.Supp.2d 166, 207–09, 213, 215–16 (D.Mass. Aug. 26, 2004).

■ The court's current reasoning on the adequacy of the evidence to prove the alleged aggravating factor that "Gary Sampson committed the carjacking resulting in the death of Jonathan Rizzo after substantial planning and premeditation to cause the death of Jonathan Rizzo" is now somewhat different than it was in November 2003. The result, however, is the same. The evidence is sufficient to prove this aggravating factor.

In the interest of accuracy and completeness, the court will describe how its understanding of the law on this issue evolved from the time the court ruled on the original Rule 29 motion to the time that the court instructed the jury on De-

203 (D.Mass. Aug. 26, 2004).

cember 19, 2003, and the reasons that the court finds the evidence is still adequate.

The pertinent statute, 18 U.S.C. § 3592(c)(9), requires that the government prove only that the defendant "committed the offense after substantial planning and premeditation to cause the death of a person." The government's Notice of Intent to seek the death penalty in this case, however, states that Sampson "committed the offense after substantial planning and premeditation to cause the death of Jonathan Rizzo."

This focus on Mr. Rizzo narrowed the relevant question and required that the government prove substantial planning and premeditation to cause the death of Mr. Rizzo particularly, not just any person generally.

The jury instructions were consistent with this narrowing. The court instructed the jury, in part, that "[t]his means the government must prove that Mr. Sampson engaged in substantial planning and premeditation to kill Mr. Rizzo. It would not be enough for the government to prove only that Mr. Sampson engaged in substantial planning and premeditation to commit the carjacking." Dec. 19, 2003 Tr. at 80. The court later reiterated to the jury that the government had to prove "substantial planning and premeditation to cause the death of Jonathan Rizzo." *Id.* at 81.

However, the analysis conducted on November 24, 2003 in ruling on the Rule 29 motion regarding substantial planning and premeditation is, in the court's view, no longer entirely appropriate. In particular, the court's reference to Mr. Sampson's decision to obtain rope from the Bourne Bridge prior to being picked up by Mr. Rizzo would not be evidence of planning and premeditation to kill Mr. Rizzo, as Mr. Sampson did not at that point know of Mr. Rizzo's existence. Similarly, Mr. Samp-

son's statements in the confession that he intended to kill whoever picked him up were not dispositive of whether there was substantial premeditation for the murder of Mr. Rizzo.

For the purpose of this aggravating factor, the analysis of the evidence cannot properly extend back beyond the point where Mr. Sampson first saw Mr. Rizzo. Any planning or premeditation prior to that point is not relevant. However, there is evidence that, when viewed in the light most favorable to the government, is sufficient to prove beyond a reasonable doubt substantial planning and premeditation after Mr. Sampson met Mr. Rizzo.

More specifically, the evidence was sufficient to prove the following beyond a reasonable doubt. Once Mr. Sampson got into the car with Mr. Rizzo, he developed a plan to kill him. To phrase it somewhat differently, he formulated a new plan, incorporating Mr. Rizzo into any previous provisional plan that he had made. If Mr. Rizzo had been a different or physically imposing person, Mr. Sampson might have developed an entirely different plan or decided not to kill him at all. The evidence indicates that this may have happened on other occasions. However, based on his assessment of Mr. Rizzo's personal and physical characteristics, Mr. Sampson developed and put into action a plan to get Mr. Rizzo to a selected spot and kill him there. Mr. Sampson considered a location for the crime and directed Mr. Rizzo to drive him to that location. The location, the Abington Ale House, was remote and isolated. The jury could have properly concluded beyond a reasonable doubt that the defendant consciously selected it for that reason.

Mr. Sampson also developed and carried out an elaborate ruse to convince Mr. Rizzo he was not in danger. He told him that

he would be sprayed with OFF!, an insect repellent, to protect him from bugs. Mr. Sampson made this false statement to lull Mr. Rizzo into a false sense of security that would make it easier for Mr. Sampson to kill him.

The jury could have properly inferred that, during the drive to the Abington Ale House, Mr. Sampson considered how he could restrain Mr. Rizzo. He knew that he had found some sturdy rope at the Bourne Bridge. During the ride and subsequent walk, Mr. Sampson decided that he could use this rope to tie Mr. Rizzo to the tree. This would be more effective than using his belt, which he had broken when he tried to subdue Mr. McCloskey. Mr. Sampson decided that it would be preferable to incapacitate Mr. Rizzo first and then attack him with a knife when he was not able to fight back. His plan was formulated during the course of a 20-mile drive to Abington.

When Mr. Sampson and Mr. Rizzo arrived at the parking lot behind the Abington Ale House, the defendant put his previously formulated plan into action. The defendant had a substantial opportunity to reconsider his decision, but did not. As the court instructed the jury on Massachusetts law, premeditation can occur in just a few seconds. *See Commonwealth v. Palmariello*, 392 Mass. 126, 466 N.E.2d 805, 816 (1984). The 30 minutes that Mr. Sampson spent in the car with Mr. Rizzo gave him an opportunity to think at length about how he could kill Mr. Rizzo.

The foregoing is enough to constitute substantial or large premeditation and planning to cause the death of Jonathan Rizzo, as the court defined those terms for the jury. *See* Dec. 19, 2003 Tr. at 79–81.

The court recognizes that the government's closing argument regarding substantial planning and premeditation began with the defendant obtaining the rope in Bourne. The government also addressed Mr. Sampson changing into his so-called "trolling outfit." This evidence preceded the defendant meeting Mr. Rizzo. There was, however, no objection to this argument, and the closing argument does not alter the Rule 29 analysis with regard to substantial planning and premeditation.

Therefore, for the reasons stated in November 2003, as modified by the foregoing, the renewed Rule 29 motion is being denied.

## III. REQUEST TO DECLARE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL BECAUSE OF WHITE VICTIM EFFECT

The request that the court declare the Federal Death Penalty Act unconstitutional because the death penalty is sought and, indeed, imposed disproportionately in cases with white victims is also being denied.

The hearing today has clarified the defendant's claim. The defendant is not raising again a Fifth Amendment claim. One form of a Fifth Amendment claim would be a selective prosecution claim focusing on the decisions made by the Attorney General. Any such selective prosecution claim is unmeritorious because the defendant has still failed to identify a similarly situated individual not prosecuted under the Federal Death Penalty Act. *See United States v. Sampson*, 275 F.Supp.2d 49, 89 (D.Mass. 2003) ("*Sampson II*").

The defendant also explains that he is not now making a claim that the jury purposefully discriminated based on the race of the white victims in this case. To prove such a Fifth Amendment claim, the defendant must prove purposeful discrimination. The Supreme Court held in *McCleskey v. Kemp*, 481 U.S. 279, 292, 107

S.Ct. 1756, 95 L.Ed.2d 262 (1987), that statistics about the operation of a system generally are not enough to satisfy that burden of proof. In addition, in this case, the jury certified that it was not influenced by the race of the victim, and there is no direct evidence, at least, to challenge that certification.

The defendant is making a claim that the death penalty is imposed by juries arbitrarily and capriciously in violation of the Eighth Amendment because defendants who kill white people are much more likely to be sentenced to death than defendants of any race who kill people who are not white. This was one issue decided by the Supreme Court in *McCleskey. Id.* at 308–19, 107 S.Ct. 1756. This issue was not addressed by this court in *Sampson II.* Therefore, the court will focus on this issue in detail now.

In *McCleskey,* the Baldus study which provided statistics concerning the operation of the capital punishment system in Georgia, took into account 230 non-racial factors, as well as the race of the victim. As the court understands it, the study identified 39 variables which were deemed particularly relevant. Baldus conducted a multiple regression analysis. His study showed that defendants in Georgia who murdered white victims were four times more likely to receive the death sentence than defendants who murdered black victims. *See McCleskey,* 481 U.S. at 320, 325, 327, 107 S.Ct. 1756 (Brennan, J., dissenting).

The five to four majority in *McCleskey* held that this presented a constitutionally acceptable risk of racial prejudice influencing capital sentencing decisions. *Id.* at 309, 107 S.Ct. 1756 (opinion of the Court). The Supreme Court wrote:

At most, the Baldus study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system. The discrepancy indicated by the Baldus study is "a far cry from the major systemic defects identified in Furman." As this Court has recognized, any mode for determining guilt or punishment "has its weaknesses and the potential for misuse." Specifically, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" Despite these imperfections, our consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious. In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.

*Id.* at 312–13, 107 S.Ct. 1756 (citations omitted).[2]

---

**2.** Justice Lewis Powell's description of the Baldus study as "indicat[ing] a discrepancy that appears to correlate with race" may understate the conclusions that can properly be drawn from that study. Statistics that take into account only race are at best capable of revealing a discrepancy that appears to correlate with race. Statistics, such as those found in the Baldus study, that take into account many other variables may reveal not only a discrepancy that appears to correlate with race, but also a racial disparity that is not explainable by other differences among cases

This reasoning was criticized by Justice Brennan in his dissent, along with others, as confusing two concepts. *Id.* at 322–24, 107 S.Ct. 1756 (Brennan, J., dissenting). The first is purposeful discrimination, which the system in Georgia and, certainly, the Federal Death Penalty Act are designed to eliminate through procedures that guide discretion and require instructing the jury that considering the race of the victim or a defendant is impermissible. The second is the way the system operates. Justice Brennan was complaining not about the way the system was constructed, but about the way he thought the Baldus study demonstrated that the system operated.

If the facts concerning the so-called white victim effect were materially different in this case, this court would have the discretion to reach the result the defendant advocates. However, the statistics the defendant has recently provided address only the race of the victim. They do not address non-racial factors and, therefore, do not permit the court to discern the impact of the race of the victim on juries' decisions when defendants are otherwise similarly situated.

As the instant case illustrates, in a federal capital case many variables must be addressed by the jury and are likely to affect each sentencing decision. The deficiency of the record with regard to detail on this issue is comparable to the problems with the defendant's evidence regarding proportionality identified by the court. *See* Oct. 31, 2003 Tr. at 48–49; *United States v. Sampson,* 01–10384–MLW, slip op. at 49, 57–58, 2004 WL 1906872, 335 F.Supp.2d 166, 194, 198–99 (D.Mass. Aug. 26, 2004).

The statistics that the defendant has provided since the verdicts in this case go

back only three years. They may not even be complete with regard to the period that they cover. However, the defendant argues that these statistics show that the odds of being sentenced to death for the killing of one or more white victims were 37 percent, seven of 19, versus eight percent, two of 26, for killing one or more non-white victims. This is a ratio of 4.625 to one.

If this number correlates to the four to one ratio discussed by Justice Brennan as emerging from the Baldus study at issue in *McCleskey,* it is not materially different than the disparity found to be insufficient to establish a constitutional violation in that case. However, according to Professor Randall Kennedy, "[w]ithout attempting to control for the possible effects of competing variables, Baldus found that perpetrators in white victim cases were 11 times more likely to be condemned to death than perpetrators in black victim cases." Randall Kennedy, *Race, Crime & the Law* 329 (1997). This analysis may not have focused on jury verdicts alone, but on all decisions made in the criminal justice system. Nevertheless, the statistics the defendant has provided since the December 23, 2003 verdict in this case are not sufficient to demonstrate that the Federal Death Penalty Act operates in an arbitrary and capricious manner which violates the Eighth Amendment. Indeed, the statistics may be less favorable to the defendant than the statistics analyzed in *McCleskey.*

The Baldus letter to Senator Feingold, which is in the defendant's original appendix at page 30 and following, states that in the federal system, the death sentencing rate is twice as high in white victim cases as it is in minority victim cases. *See* Def.'s Appx. in Supp. of Pre–Trial Mots. at A31.

that are accurately represented by the non-

racial variables.

This appears to be only half of the four to one disparity found to be constitutionally acceptable in *McCleskey.*

In addition, the letter does not, at least explicitly, address the other variables that might provide a racially neutral explanation for this disparity. Therefore, this court is not declaring the Federal Death Penalty Act unconstitutional because of the alleged white victim effect.

However, as both the government and the defendant have stated today, it would be valuable to have an updated Baldus-type comprehensive study of the operation of the Federal Death Penalty system. As this court understands it, the study that the Department of Justice undertook or completed in about 2000, and later supplemented, does not focus on jury verdicts. It focuses on how the prosecutors make decisions. *See U.S. Dep't of Justice, The Federal Death Penalty System: A Statistical Survey (1988–2000)* (2000); U.S. Dep't of Justice, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (2001) (Spec. Appx. in Supp. of Def.'s Pre–Trial Mots.) (Docket No. 142). It would be important to know if any white victim effect discernible in jury verdicts is more pronounced in the federal system now than it was shown to be in Georgia in the *McCleskey* case.

The possible effect of *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which allowed victim impact evidence in capital cases, could also be important to analyze. *Payne* is a 1991 decision. *McCleskey* is a 1987 decision. It is not clear to the court to what extent the states were admitting victim impact evidence prior to the 1991 decision in *Payne* that reversed the 1987 decision in *Booth v.*

*Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which excluded such evidence. However, since *Payne* victim impact evidence has been permissible and, as the court understands it, it is now a regular, legitimate feature of capital trials.

The jury in this case did not find that Sampson would be dangerous in prison. The jury did find that he committed two especially heinous, cruel, and depraved murders, and a third murder as well. Those were aggravating factors. However, its verdict and the court's observations suggest that the jury may have given substantial weight to the victim impact evidence it heard. This was perfectly permissible. There was powerful, poignant victim impact evidence presented, and the jurors were permitted to give it what they deemed to be appropriate weight.

The court and the parties went through a meticulous process of selecting the jury from the pool in Eastern Massachusetts. However, what emerged was a jury of essentially white middle class people listening to the poignant, powerful testimony of essentially white middle class survivors of Mr. Sampson's utterly innocent victims.

The court does not doubt at all that the jurors truly believed that they would have imposed the same sentence if Mr. Sampson's victims were minorities, as their certifications state. The court instructed the jurors specifically that "victim impact evidence should not be considered as implying that defendants whose victims were assets to the community are more deserving of punishment than those whose victims are perceived to be less worthy." Dec. 19, 2003 Tr. at 45.[3] This language is virtually word for word what the Supreme

---

**3.** The court went on to instruct the jury that "[o]ur nation's laws recognize and protect the equal dignity of every human life, but the loss of a human life inflicts unique harm on each victim's family." *Id.*

Court said in *Payne,* 501 U.S. at 823, 111 S.Ct. 2597.

However, there is reportedly "[a] substantial body of experimental literature [that] has established the basic proposition that the more a decisionmaker identifies and empathizes with the person being judged, the more likely the decision maker is to adopt that person's perspective." Scott E. Sundby, "The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims," 88 *Cornell L.Rev.,* 343, 374 (2003) (citing Lynda Olsen–Fulero & Solomon M. Fulero, "Commonsense Rape Judgments: An Empathy–Complexity Theory of Rape Juror Story Making," 3 *Psychol. Pub. Pol'y & L.* 402, 409–10 (1997)). This is also an issue that is very thoughtfully discussed by Professor Randall Kennedy in his book, *Race, Crime & the Law,* particularly in the concluding part of his discussion of *McCleskey,* at 349–50, 107 S.Ct. 1756.

It is possible that the Federal Death Penalty Act, with its requirement that aggravating and mitigating factors be explicitly identified by the jury and weighed, has diminished the white victim effect generated by the Georgia statute in *McCleskey,* which gave the jury unfettered discretion to impose the death penalty if a single statutory aggravating factor was found. *See McCleskey,* 481 U.S. at 333, 107 S.Ct. 1756 (Brennan, J., dissenting) (describing operation of Georgia statute). While the result would be uncertain, as counsel for both parties and the court have said earlier, a rigorous, honest study of the federal system illuminating this issue would be valuable.

Even if the current relevant statistics do not demonstrate a more pronounced white victim effect than was assumed in *McCleskey,* the Supreme Court might reconsider and reverse that decision. The Supreme Court reversed itself on the constitutionality of victim impact evidence, evidentially without receiving any material new information after *Booth,* which prohibited such evidence in 1987, and prior to *Payne,* which held in 1991 that the introduction of such evidence was constitutionally permissible.

In addition, based on the evolution of events, the Supreme Court reversed itself on the question of the constitutionality of executing the retarded, going from *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) in 1989, which permitted the retarded to be executed, to *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) in 2002, which held that the execution of the retarded was constitutionally prohibited.

*McCleskey* was a five to four decision. Justice Powell wrote the majority decision. According to his former law clerk and biographer, John Jeffries, Jr., Justice Powell later said that his own "understanding of statistical analysis ... ranges from limited to zero." John Jeffries, Jr., *Justice Lewis F. Powell, Jr.* 439 (1994) (ellipses in original).[4] Late in his life, he also told Professor Jeffries that he would change his vote in *McCleskey* and every other capital case. *Id.* at 451–52.

However, where, as here, the evidence does not prove an alleged white victim effect that is more pronounced than the Supreme Court found to be constitutionally acceptable in *McCleskey,* the lower courts may not properly declare the Federal Death Penalty Act unconstitutional for this reason. *See Sampson,* 275 F.Supp.2d at 72 (citing *Agostini v. Felton,* 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,* 490 U.S. 477, 484, 109

---

**4.** This court's understanding of statistics is no     better.

S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Nevertheless, it should be acknowledged that there is an important question concerning the constitutionality of the death penalty that would benefit from renewed rigorous analysis and candid consideration, not only by the courts, but by legislators and citizens, as we all continue the constitutional quest for equal justice.

## IV. REQUEST TO DECLARE THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL BECAUSE OF RELAXED EVIDENTIARY STANDARDS

The defendant's request that this court find the Federal Death Penalty Act unconstitutional for the reasons described by the District Court in *United States v. Fell,* 217 F.Supp.2d 469, 485–89 (D.Vt.2002) is denied.[5]

There are some issues that are ripe for adjudication prior to trial and some that are not. *See Sampson II,* 275 F.Supp.2d at 66–71. For the reasons described in August 2003 more reliably than for the reasons more briefly described in January 2003, this decision was not ripe to decide before trial. *Id.* at 95–96; *United States v. Sampson,* 245 F.Supp.2d 327, 338–39 (D.Mass.2003) (*"Sampson I"*). This issue is now sufficiently definite to be decided because the court now knows what evidence was admitted and what evidence was not.

In *Fell,* the District Court found that 18 U.S.C. § 3593(c) violated the defendant's Fifth Amendment right to due process and Sixth Amendment right to confront witnesses against him. Section 3593(c) states in part that at the penalty phase of a trial in a capital case, "information is admissi-

ble, regardless of its admissibility under the Rules of Evidence at criminal trials, except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."

In *Fell,* the District Court evidently felt it would be obligated to admit under § 3593(c) a statement by Fell's deceased codefendant, which would not be admissible under the Federal Rules of Evidence.

As this court recognized during trial, the defendant had a Fifth Amendment right to due process and a Sixth Amendment right to confront witnesses at the penalty phase of his trial. *See Romano v. Oklahoma,* 512 U.S. 1, 12, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

Due process requires that the admission of evidence not violate "fundamental conceptions of justice." *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The confrontation clause of the Sixth Amendment provides a right to cross-examine witnesses and to physically face them. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

The Federal Rules of Evidence, however, are not coextensive with the requirements of due process, as the Supreme Court reiterated in *Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The Federal Rules of Evidence are rooted in the Supreme Court's supervisory powers, not in the Constitution. *Id.; United States v. Haynes,* 269 F.Supp.2d 970, 985–86

---

5. At the time the court decided this issue in January 2004, the Second Circuit had yet to rule on the government's appeal in *Fell.* On March 2, 2004, the Second Circuit vacated the district court's judgment and remanded the case. *United States v. Fell,* 360 F.3d 135 (2d Cir.2004).

(W.D.Tenn.2003). Indeed, prior to 1972, there were no Federal Rules of Evidence. However, there were constitutional limitations on the evidence that could be admitted at trials, including capital trials.

 In any event, the defendant has not identified any information presented to the jury by the government that would not have been admissible under the Federal Rules of Evidence. The defendant has also not identified any evidence admitted against him that allegedly violates his right to due process. Nor has the defendant identified any instance where he was denied his right to physically face a witness or to cross-examine him or her.[6]

As foreshadowed by the court's observations in *Sampson I*, 245 F.Supp.2d at 339 and *Sampson II*, 275 F.Supp.2d at 94, not applying the Federal Rules of Evidence has helped the defendant rather than hurt him. For example, the defendant was able to introduce through Jill Miller, a social worker, and Dr. Hegarty, a psychiatrist, his own out of court statements regarding remorse and other relevant issues, without subjecting himself to cross-examination. These statements would not have been admissible under Rule 801 of the Federal Rules of Evidence.

Although the record will have to be reviewed, the court may also have excluded evidence offered by the government under § 3593(c)'s balancing test, which would have been admitted under the Rule 403 balancing test that requires that probative value be "substantially outweighed" by the danger of unfair prejudice, not merely "outweighed" as provided in § 3593(c).

Therefore, § 3593(c), as it operated in this case, did not violate Mr. Sampson's Sixth or Fifth Amendment rights.

## V. ORDER

Accordingly, it is hereby ORDERED that:

1. Defendant Gary Lee Sampson's motion for a new trial, or, in the alternative for an evidentiary hearing (Docket No. 655) is DENIED.

2. Sampson's post-verdict motion (Docket No. 657) is DENIED.

---

6. The court imposed the restrictions on Dr. Welner's expert testimony that would have been imposed under Rule 703 of the Federal Rules of Evidence. Furthermore, the court instructed the jury that any hearsay on which Dr. Welner relied could only be considered for the limited purpose of evaluating his opinions.